STATE OF LOUISIANA

VERSUS

JOSHUA L MARTIN AKA "JOSHUA DENNIS"
AKA "RUGA"

NO. 24-KA-233

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 22-2977, DIVISION "N"
HONORABLE STEPHEN D. ENRIGHT, JR., JUDGE PRESIDING

February 26, 2025

**MARC E. JOHNSON**
**JUDGE**

Panel composed of Judges Marc E. Johnson,
Stephen J. Windhorst, and Scott U. Schlegel

<u>**AFFIRMED**</u>
**MEJ**
**SJW**
**SUS**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Waquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Honorable Paul D. Connick, Jr.
     Thomas J. Butler
     Monique D. Nolan
     Eric Cusimano
     Piper Scotton

COUNSEL FOR DEFENDANT/APPELLANT,
JOSHUA L MARTIN
     Mary Constance Hanes

**JOHNSON, J.**

Defendant, Joshua L. Martin, aka "Joshua Dennis", aka "Ruga", seeks review of his December 2023 convictions of armed robbery and possession of a firearm by a felon. For the following reasons, we affirm Defendant's convictions and sentences.

### FACTS AND PROCEDURAL HISTORY

The following facts were adduced through testimony and exhibits at trial on December 4, and 5, 2023.

On April 24, 2022, former Jefferson Parish Sheriff's Office ("JPSO") Deputy Justin D'herete responded to a carjacking signal at 6220 Riverside Drive in Metairie. The 9-1-1 call reporting a carjacking at the Riverside Court Condominiums went out at 10:08 p.m. The deputy arrived at the scene shortly thereafter. He questioned the victim, Ms. Evelyn Simonett, while equipped with a bodycam; he identified the victim and a bystander on the bodycam footage played for the jury. Ms. Simonett had walked around the condominiums for approximately ten to twenty minutes to find someone to help her call 9-1-1. Deputy D'herete explained that the shirt that she was wearing was torn and had blood on it. He also testified that there were visible contusions on her face and that it was bloody and swollen. He also stated that her hands were bloody. He testified that Ms. Simonett relayed that the perpetrator's name was "Ruga[1]."

Ms. Simonett explained to Deputy D'herete that she met the perpetrator at the "detail shop," a place she used to work, two days before. They spoke for about 30 - 45 minutes while he detailed her car, a black 2018 Chevrolet Sonic. On April 24th, the perpetrator texted her "around nine[p.m.]" and asked for a ride. She picked him up at the detail shop and they drove less than 10 minutes to an apartment complex. When she stopped the car in the parking lot of the Riverside

---

[1] Deputy D'herete explained that he mistakenly spelled the nickname as "Juga" in his report.

Court Condominiums, he pulled a gun out of a backpack and told her to get out of the car. She told him that he would have to kill her, and he hit her on the head with his handgun five or six times. Then, he pulled her out of the car and sped off. Ms. Simonette also told Deputy D'herete that the perpetrator told her that he was going to kill her when he put the gun to her head. At the end of the bodycam footage, EMS was seen attending to Ms. Simonett.

Deputy D'herete stayed on the scene to look around but could not locate where the incident occurred in the parking lot. Later, he met Ms. Simonett at Ochsner Hospital in Kenner to continue to interview her, but she did not remember anything else. Deputy D'herete determined that the Klean King[2] car wash on Veterans Memorial Boulevard was the car wash Ms. Simonett referred to in her statement. He went to the car wash to see if there were video cameras that could provide evidence. JPSO Robbery Division then took over the investigation.

Ms. Simonett testified at trial that she was sixty-four years old and on disability. She lived with and cared for her mother and her autistic nephew. She gave "the gentleman" a ride that night because she would want someone to do the same for her. She stated that she met him the day before[3] the incident occurred at the Klean King car wash, while her car was being detailed. She exchanged phone numbers with the perpetrator because he was interesting to talk to. She testified that they just talked about life in general and spoke for less than an hour.

On the night of the incident, she picked the perpetrator up at Klean King. Ms. Simonett noticed he had his cell phone underneath his right leg and thought it was suspicious. She pulled into the "driveway" of the apartments, and he would not get out of the passenger seat of the car. She stated that there was a Caucasian man across the street from where they parked, and the perpetrator kept staring at

---

[2] The car wash is referred to as "King Klean" and "Klean King" car wash throughout the trial. The record reflects, however, that the actual name of the car wash is "Klean King."

[3] She explained on the stand that she meant the day before when she said "two days ago".

him. Ms. Simonett testified that the perpetrator held the gun to her and said, "Give me your car." She told him, "You can kill me, but you're not getting my car." Ms. Simonett stated that the man started to hit her with his gun in her face and on her head. He then opened the passenger door and pulled her out through the passenger side of the car onto the ground. He closed the door and ran quickly to the driver's side and drove away. Ms. Simonett testified that her cell phone was in the door of the car, and her wallet was under her seat.

After the incident happened, it took her approximately ten minutes to find someone to help her. Ms. Simonett had never been to that part of town before. She tried to flag down cars after the incident but was unable to receive assistance from anyone. The only person who stopped for her was a "Good Samaritan who stopped with a bat in his hands." She testified that he "took her in from there" and called 9-1-1.

Ms. Simonett recalled going to the hospital that night, but she could not remember how long she stayed. The next day her mother called the paramedics and told them Ms. Simonett was incoherent so Ms. Simonett went to the hospital again. She was shown a photo lineup after the incident, but she could not identify anyone in the photographs as the perpetrator.

At trial, Ms. Simonett did not recognize anyone in court as the man who committed the robbery. She testified that the perpetrator was a black male who was approximately 5'4" or 5'5". His nickname was Ruga. He wore a dark short-sleeved shirt, dark pants, and had a "do-rag" on his head. She explained that the day before, when she met him, she noticed that he had dreadlocks. On the night of the incident, she could see the dreadlocks from underneath the do-rag. Ms. Simonett testified that she saw the perpetrator again at Star gas station, but he did not recognize her. She testified that she called Detective Eric Hymel to report the

sighting. Approximately one week later, she was called to "identify some photos," but she did not see the perpetrator in the lineup.

On cross-examination, Ms. Simonett testified that she noticed the perpetrator's brown eyes, and did not notice whether he had any tattoos on his face. During redirect, Ms. Simonett testified that she was only confused about the perpetrator's height. She thought he was 5'11", but she is 5'7" and the perpetrator was shorter than her. She estimated his actual height was 5'4".

JPSO patrol officer Ellied Riley received a "camera hit" notification for a stolen vehicle from the Automated License Plate Recognition System (ALPR). On April 29, 2022, around midnight, he recognized the vehicle from the camera hit at a RaceTrac gas station in Gretna. Officer Riley observed a white female in the driver's seat and a black male in the passenger's seat. He confirmed the license plate number with headquarters, and while he waited for other officers to arrive, the car sped off. Officer Riley pursued the vehicle northbound on Lapalco Boulevard and then southbound on Wall Boulevard. When the vehicle was located, it had crashed into a house and was totaled. Officer Riley did not observe the vehicle crash, or the driver and passenger exit the vehicle. Officer Riley did not search the vehicle.

Detective Dustin Ducote worked in JPSO's digital forensics unit and was accepted by the court as an expert in mobile device forensics. The unit received three iPhones in connection with the instant matter. An extraction was performed on each of them, which revealed identifying information.

Detective Ducote identified a black iPhone 13 mini in a clear case ("Defendant's Phone"). He testified that the extraction reflected that the Apple ID associated with the phone was "joshuadennis463@gmail.com." The device name

was "Joshua's iPhone." The Snapchat name associated with the phone was "rugaxsavage." The phone number associated with the phone was 504-***-5991.[4,5]

Detective Ducote also identified an iPhone XR (iPhone 10) ("Kayla's Phone"), and the Apple ID associated with the phone was "kkleblanc2817@gmail.com," and the device name was "Kayla's iPhone." He testified that on Kayla's iPhone, the contact name associated with Joshua Dennis' number was "my favorite a**hole."

He identified text messages between Kayla's iPhone and Defendant's iPhone. The text messages, sent on April 24, 2022, beginning at 9:40 p.m. read:

"She got one wit a tracker" (from Defendant's iPhone)

"Wat yu wan me do?" (from Defendant's iPhone)

"How Yk[6]" (from Kayla's iPhone)

"It's a computer dash" (from Defendant's iPhone)

"[emoji reply]" (from Kayla's iPhone)

"wat yu think" (from Defendant's iPhone)

"Hurry up" (from Defendant's iPhone)

"Get it" (from Kayla's iPhone)

"It can't be activated right away" (from Kayla's iPhone)

(Footnote added).

Detective Ducote testified that the text messages between the two included texts sent from April 22 to April 26, 2022. He also was able to access a video from Kayla's phone that showed a black Chevrolet Sonic, Ms. Simonett's vehicle. The video was dated April 25, 2022, and it was taken at 3:18 p.m. A still shot of the video was entered into evidence.

---

[4] Out of an abundance of caution, the phone numbers are redacted. *See State v. Murray*, 17-534 (La. App. 5 Cir. 3/14/18) 242 So.3d 821, 825 n.3.
[5] A screenshot of the identifying information of the iPhone was admitted.
[6] Detective Ducote testified that "YK" was slang for "you know."

Detective Ducote identified a third iPhone ("Kayla iPhone #2"). The Apple ID on the phone was Kayla LeBlanc or "kkleblanc2817@gmail.com." He stated that, in Kayla's second phone, the contact name for the same telephone number associated with Defendant was "Bam "Broski"[7]." Detective Ducote identified a photograph of Defendant that was found on Kayla's "first phone" [Kayla's iPhone] He testified that the photo was dated April 24, 2022, at 1:04 p.m. He also found a photo of Defendant and Kayla together on the same phone. The photo was dated April 22, 2022, and was taken at 8:07 p.m.

Detective Eric Hymel of JPSO's Robbery Division was assigned to the armed robbery that occurred in the instant matter on April 24, 2022, at the Riverside Court Condominiums in Metairie. Detective Hymel initially made contact with Ms. Simonett by phone because she was still receiving treatment for her injuries. He learned from Ms. Simonett that she met with the perpetrator the day prior to the robbery while she was getting her vehicle detailed. She told him that the individual called her the night of April 24th between approximately 9:00 and 9:30 p.m. and asked for a ride. Once they arrived at the apartments, the perpetrator told her to get out of the car and then struck her multiple times with a firearm, causing severe injuries to her face. She was then removed from the vehicle, and the perpetrator drove away in the vehicle. Ms. Simonett described the perpetrator as a twenty to thirty-year-old Black male, thinly built, whose nickname was "Ruga."[8] She recalled that he was wearing a do-rag, all black clothing, and had tattoos on his arms. Detective Hymel testified that Ms. Simonett never reported to him that the perpetrator had dreadlocks.

---

[7] Review of the exhibit in question reveals the contact is listed as "Bam "Broski,"" which appears in the transcripts as "Van Broskey" and "Bam Broskey" along with the notation "(spelled phonetically)".

[8] Detective Hymel testified that initially, Ms. Simonett reported that the perpetrator's nickname was "Juga." He stated that she later corrected it and stated it was "Ruga." Detective Hymel explained that he credited the mistake to her injuries because she required stitches to her mouth which caused speech impediments.

Detective Hymel testified that some of Ms. Simonett's belongings were still inside of her vehicle when it was taken, including her purse and cell phone. The detective obtained a search warrant for Ms. Simonett's phone records to see what numbers contacted her during the time frame of the robbery. The 9-1-1 call came in for this incident at 10:08 p.m. He identified the number that called Ms. Simonett during the relevant time frame and conducted a search of the phone number.

Detective Hymel obtained surveillance video from Riverside Court Condominiums and Victorian Condominiums, which was on the other side of the street; he did not obtain anything of evidentiary value from these videos. He also obtained surveillance from Klean King car wash. He identified Ms. Simonett arriving in her black vehicle based on the time frame she gave him during her statement. A subject was observed walking to the car, which was parked along Veterans Boulevard. He explained that the video had a ten-minute time discrepancy. The surveillance video was played in court, and Detective Hymel testified that at the 9:47:40 timestamp (actually 9:37 p.m.) a black sedan arrived at Klean King car wash and parked along Veterans Memorial Boulevard. A subject in dark clothing was seen walking towards the vehicle, which was identified as Ms. Simonett's vehicle. The video then showed the vehicle traveling westbound on Veterans Memorial Boulevard. He testified that the video corroborated Ms. Simonett's statements and the timeline of events.

Detective Hymel learned that on April 29, 2022, the Second District Patrol Division received an alert from the license plate recognition system regarding Ms. Simonett's vehicle at a RaceTrac gas station on the corner of Wall and Lapalco Boulevard. The vehicle fled, and the deputy gave pursuit. The vehicle crashed into a private residence. The two occupants, a white female driver and a black male passenger, fled and were not apprehended. The vehicle was taken into JPSO custody and photographed. The photographs included a photo of the license plate

of Ms. Simonett's black Chevrolet Sonic. Also included in the photographs was a photo of what Detective Hymel identified as a black Steve Madden bag located by the brake pedal. He found a driver's license issued to Kayla Tyler LeBlanc and Ms. Simonett's debit card inside the bag. A red Apple iPhone with a clear Guess case was found on the driver-side floorboard, and a black Apple iPhone with a clear case was found on the front passenger floorboard.

Detective Hymel inspected the black iPhone and discovered that the home screen had a photograph of a black male with a short beard, who was wearing a "do-rag," and kissing a white female. The red iPhone had notifications on the lock screen that included an Instagram notification from "rugaxsavage9."

Detective Hymel received the extraction information from the iPhones collected from Ms. Simonett's car from the digital forensics unit. He searched for the Instagram name "rugaxsavage9" and obtained a search warrant for the account. He testified that the name "Ruga" immediately stuck out to him. The account was not private, and he discovered numerous photographs of who he identified as Joshua Dennis based on prior law enforcement database searches. He discovered that "Joshua Dennis" and "Joshua Martin" were the same person through a search of the JPSO "ARMS system," and the names were linked through a unique number given to arrestees. "Joshua Martin" was also the alias used on a previous arrest for Joshua Dennis.

Defendant's Instagram account records included a photograph posted to Instagram of a black male wearing a black "do-rag" with tattoos on his face, neck, and arms. The male was standing in front of a yellow brick wall and had a firearm in his pocket. Detective Hymel recognized the building was the Klean King car wash and identified Defendant as the individual in the photo. He said that Defendant had a "very specific tattoo" on his right hand of the letter "B." The records indicated that the photograph was taken on April 27, 2022, at 2:00 p.m.

Detective Hymel also found a direct message between rugaxsavage9 and another Instagram user with a photo for a cash app profile, with the name "Joshua Dennis", and the username "$rugaxsavage900."

Klean King car wash personnel advised Detective Hymel that Ruga/Joshua was in a relationship with a white female. The photo on the home screen of the black iPhone 15 found in the car was identical to a photo from rugaxsavage9's Instagram. The woman in the photo was confirmed to be Kayla LeBlanc.

Detective Hymel testified that he received T-Mobile phone records from Ms. Simonett's phone number. In examining the records, he found corresponding phone calls from Defendant's phone number while she was traveling to Klean King's car wash, prior to the crime being reported.

According to the reports, Detective Hymel testified that two phone calls were made from 504-***-5991 on April 24, 2022, at 9:13 p.m. and 9:32 p.m. He stated that he looked up the phone number in the JPSO ARMS database and discovered that there was a call for service to JPSO's 9-1-1- system placed by 504-***-5991 on April 11, 2022. Records provided that the call was reported from 6525 Veterans Memorial Boulevard, the address of Klean King's car wash. The 9-1-1 caller stated his phone number and his name, Joshua. The caller stated that his girlfriend, Kayla, was sick. Detective Hymel testified that the phone number that made the 9-1-1 call on April 11th matched the phone number of the incoming calls to Ms. Simonett's phone on April 24th at 9:13 p.m. and 9:32 p.m.

Detective Hymel reiterated that the 9-1-1 call for the armed robbery went out at 10:08 p.m., and the location of Ms. Simonett's phone (provided by the phone records' coordinates) indicated that at 10:02 p.m., she was located in the area of Riverside Drive. That fact corroborated what he learned from Ms. Simonett.

JPSO issued arrest warrants for Defendant and Kayla Leblanc. Detective Hymel testified that after the suspects were arrested and interviewed, he contacted

Ms. Simonett. She told him that she had seen the perpetrator at a gas station and the man who she believed committed the armed robbery had dreadlocks. Detective Hymel testified that at that point in the investigation, after his extensive research, there had been no mention of dreadlocks. He stated that this was a "misremembrance" on Ms. Simonett's part, due to the long period of time that had elapsed since the incident and the trauma she had suffered. A photographic lineup procedure was conducted but Ms. Simonett was unable to identify the perpetrator from the lineup. Defendant was "number 3" in the lineup shown to Ms. Simonett. The lineup procedure was conducted approximately three months after the armed robbery occurred.

Detective Hymel testified that when Kayla was arrested, she filled out a *Miranda*[9] rights form and elected to make a statement to him. The date of birth she provided on the form, August 14, 2000, matched the date of birth on the license found in Ms. Simonett's car. He testified that in her statement, Kayla indicated that she knew the Defendant as "Ruga." She was arrested with a purple phone, and she identified it as her own. Kayla gave Detective Hymel consent to search her phone and gave him the passcode. In the phone, Detective Hymel located and photographed an Instagram conversation in which Kayla alluded to an incident that occurred in which she was injured in "a real bad wreck." The message was dated April 30th at 2:03 p.m.

Detective Hymel then showed photographs to Kayla. She identified the red iPhone as her own. Detective Hymel also showed her the photograph of the Instagram messages of the home screen of her iPhone. Kayla stated that the username "5040.kay[10]" was her Instagram username. She identified herself and a male in her picture as Ruga. She also identified the photograph of her ID and her

---

[9] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[10] The Instagram user name is spelled as it appears on the picture of the notifications on her phone's home screen: an exhibit admitted into evidence. The username is spelled differently in the transcript.

Steve Madden bag. She offered to give the detective information regarding a theft that occurred as an explanation of how those things were found in the vehicle.

Defendant was arrested and read his *Miranda* rights. Defendant signed the form and agreed to waive his rights. The audiovisual recording of Defendant's statement was played for the jury. On the video, Defendant explained that he worked at Klean King and that his co-workers called him Joshua. He initially denied having the nickname "Ruga" and stated that there was another guy at Klean King with that name, who was much thinner than him and who also had tattoos. He denied any involvement in taking someone's car or an armed robbery. He stated that someone stole all of his things from Klean King, which included his bag, his phone, and his girlfriend's phone. When asked why Kayla would call him Ruga, he stated that she did not call him that. He stated that he and Kayla had been together for a few months. When asked why Kayla would give Detective Hymel his name, Defendant replied that she was probably scared. Defendant eventually admitted that he lied to Detective Hymel about his nickname because of his involvement with drugs. When shown photographs of items found in Ms. Simonett's vehicle, Defendant identified Kayla's phone. He stated that her phone was stolen on April Fool's Day. When Detective Hymel showed him a picture of the black iPhone, he stated that it was his phone. When shown his photograph with Kayla on the home screen, Defendant stated that it was not him in the picture and that he had tattoos on his face. He stated he did not know who the girl was. He reiterated that his phone was stolen. Detective Hymel asked if someone was using his social media accounts to communicate with people at that time. Defendant replied affirmatively and said that he no longer had those accounts.

During the recorded statement, Defendant identified photographs shown to him of Kayla's phone and ID and stated that someone stole those items along with her purse. When shown the photo of Ms. Simonett's crashed vehicle, he exclaimed

that he was not injured and expressed shock over the state of the front of the car. Detective Hymel asked Defendant if someone impersonated him for a whole month. Defendant repeated that he had a new phone and that his and Kayla's phones were stolen. Defendant began cursing and denied any involvement in the armed robbery. Defendant also denied ever having a gun. When asked how he could explain texts between him and his family and photos taken on his phone after it was apparently stolen, Defendant stated it could have been done by other people. With Defendant's permission, Detective Hymel took a DNA swab from him.[11]

Detective Hymel issued a subpoena for 504-***-5991 (Defendant's phone number) to obtain phone records from AT&T. Detective Hymel testified that the records corroborated information from the T-Mobile records collected for Ms. Simonett's phone -- Defendant's phone records provided that on April 24, 2022, at 9:14 p.m. and at 9:32 p.m., he called Ms. Simonett's phone number (504-***-6012). Detective Hymel examined the extractions of the phone that were conducted by JPSO's digital forensics unit and confirmed that the phone number of the black iPhone found in Ms. Simonett's vehicle matched the number that called Ms. Simonett. Defendant's phone records also provided location data showing his location at approximately 9:13 p.m. and 9:32 p.m. were close to Klean King and "hit" off a tower nearby.

Detective Hymel reviewed extractions of Kayla's cell phones and located a video of a male subject who used the phone to record video of what he realized was Ms. Simonett's black Chevrolet Sonic. He was able to identify Ms. Simonett's vehicle because the video panned from numerous sides of the vehicle. The detective recognized the white female driver in the video as Kayla. The video also showed the "B" tattoo on Defendant's hand.

---

[11] On cross-examination, Detective Hymel confirmed that he did not perform a DNA search of Ms. Simonett's vehicle.

Detective Hymel viewed text messages from Defendant's phone number to Kayla. He stated that he interpreted "she got one with a tracker" to mean the vehicle had the ability to be tracked. He testified that what also stuck out to him was the date and time of the text messages, April 24, 2022, at 9:40 p.m. According to the timeline, the messages were sent after Ms. Simonett picked Defendant up and before 9-1-1 was called. He confirmed there was communication between Defendant's phone number and Kayla's phone number after the robbery took place.

Detective Hymel testified that Google searches for information on vehicle tracking and tracking features from Kayla's phone were performed during the time frame when Defendant sent her a text asking what she wanted him to do.

Kayla LeBlanc testified that, in the instant matter, she pled guilty and was convicted of armed robbery, and was presently serving her sentence. She stated that she did not know a "Ruga." Kayla refused to answer questions by the State or confirm any of the assertions the State alleged she made in her statement. The State asked the court to designate Kayla as a hostile witness. Kayla confirmed that Detective Hymel asked her what color her iPhone was, and she answered that it was red. She testified that she was "loaded" and on drugs during her statement. On cross-examination, she denied any involvement in the armed robbery with Defendant.

On July 25, 2022, the Jefferson Parish District Attorney filed a bill of information charging Defendant, Joshua L. Martin, with armed robbery with a firearm in violation of La. R.S. 14:64 (count one) and possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (count two). Both counts were alleged to have occurred on or about April 24, 2022.

Defendant was arraigned on July 25, 2022, and pled not guilty. Later, the State filed a superseding bill of information that added Kayla LeBlanc as a

defendant charged in count one of the bill (armed robbery)[12]. On February 10, 2023, the State added Defendant's aliases to the bill of information. The aliases were listed as "Joshua Dennis" and "Ruga." On May 8, 2023, the State amended the previous conviction listed in the bill of information for count two from "armed robbery" to "first degree robbery in violation of 14:64.1."

On December 5, 2023, the jury found Defendant guilty as charged on both counts. On January 11, 2024, Defendant filed a motion for new trial and motion for post-verdict judgment of acquittal. After a hearing the same day, the trial court denied both motions. Defendant waived sentencing delays, and the trial court sentenced Defendant to twenty years imprisonment at hard labor to be served without the benefit of probation, parole, or suspension of sentence on count one. As to count two, the trial court sentenced Defendant to fifteen years imprisonment at hard labor to be served without the benefit of probation, parole, or suspension of sentence. Both counts were ordered to run concurrently with one another.

On the same date, the State filed a multiple offender bill of information on count one (armed robbery), alleging that Defendant was a second-felony offender, having previously pled guilty on January 7, 2014, to a violation of La. R.S. 14:64.1, first degree robbery in Case No. 13-4781 of the 24th Judicial District Court in Jefferson Parish. A multiple bill hearing was held on February 8, 2024. After the hearing, the trial court adjudicated Defendant as a "double felony offender." Defense counsel objected to the court's finding. The trial court vacated the previous sentence as to count one and sentenced Defendant as a "double felony offender" to sixty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The trial court ordered the sentence to

---

[12] The amended bill of information indicates that there was an amendment to count one on March 3, 2023, "as to Kayla LeBlanc only." The amendment strikes "to wit a firearm" from count one. The record reflects that Ms. LeBlanc pled guilty to La. R.S. 14:64, armed robbery, on March 3, 2023.

run concurrently with the sentence it issued earlier on count two and with any other sentences Defendant was currently serving.

On March 6, 2024, defense counsel filed a motion for appeal, which was granted on March 8, 2024.

## *ASSIGNMENTS OF ERROR*

Defendant argues that the evidence to support his convictions was insufficient and that the State did not prove beyond a reasonable doubt that he was the man who committed armed robbery of the victim's vehicle. Defendant points to the fact that no witness, including his co-defendant Kayla LeBlanc, who pled guilty, identified him as the perpetrator. Further, Ms. Simonett, the victim, did not identify him in a photographic lineup, or in court, and he does not match the physical description she gave to the police of her attacker.

The State counters that, although the victim was unable to make a positive identification, it set forth sufficient evidence to prove Defendant's identity beyond a reasonable doubt. The State urges it proved Defendant's identity as the perpetrator of the crimes through testimony and evidence linking Defendant to the armed robbery and that there is no merit to Defendant's assignment of error. The State argues that Ms. Simonett attempted to identify him out of a lineup several months after the violent armed robbery, and the trial took place more than a year and a half after the crime occurred.

Furthermore, the victim was able to provide some identifying information that pointed to Defendant's identity as the perpetrator, including his nickname, "Ruga," details about cell phone calls between them, his presence at Klean King, and his physical description. The State avers that, even assuming that the discrepancies were not explained, the discrepancies go to the credibility of the witness. Defense counsel cross-examined Ms. Simonett about any discrepancies in identifying Defendant, and the jury found her credible. The State cites to *State v.*

*Preston,* 15-306 (La. App. 5 Cir. 10/28/15), 178 So.3d 207, 211, *writ denied*, 15-2169 (La. 11/18/16), 210 So.3d 283, and argues that Ms. Simonett was able to provide ample testimony in conjunction with the State's evidence that negated any probability of misidentification.

## LAW AND DISCUSSION

First, in this case, Defendant did not file a motion to reconsider sentence. He was convicted on December 5, 2023 and originally sentenced on January 11, 2024. The motion for appeal was filed on March 6, 2024, more than thirty days after the original sentencing. As such, the filing of the motion for appeal was untimely in part; the motion for appeal is timely with regards to the multiple bill proceedings. However, the motion for appeal as to Defendant's original proceedings is untimely. Nevertheless, in the interest of judicial economy and the avoidance of useless delay, we will consider Defendant's appeal. *See State v. Raines*, 24-177 (La. App. 5 Cir. 12/18/24), -- So.3d --, 2024 WL 5153198 at *4.

The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. *State v. Williams*, 20-46 (La. App. 5 Cir. 12/30/20), 308 So.3d 791, 816, *writ denied*, 21-316 (La. 5/25/21), 316 So.3d 2. Defendant filed a post-verdict judgment of acquittal and a motion for new trial in January 2024. Both motions were denied on the same date.

In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct, circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804. Circumstantial evidence consists of proof of collateral facts and circumstances

from which the existence of the main fact can be inferred according to reason and common experience. *State v. Gatson*, 21-156 (La. App. 5 Cir. 12/29/21), 334 So.3d 1021, 1034. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 provides, "[A]ssuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Woods*, 23-41 (La. App. 5 Cir. 11/15/23), 376 So.3d 1144, 1155, *writ denied*, 23-1615 (La. 5/29/04), 385 So.3d 700. This is not a separate test from the *Jackson* standard but rather provides a helpful basis for determining the existence of reasonable doubt. *Id*. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational trier of fact could not have found proof of guilt beyond a reasonable doubt. *State v. King*, 22-371 (La. App. 5 Cir. 5/24/23), 365 So.3d 897, 907, *writ denied*, 23-790 (La. 1/17/24), 377 So.3d 242, *cert. denied*, 23-7253 -- U.S.--, 144 S.Ct. 2694, 219 L.Ed.2d 1305 (2024).

The directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 702. This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. *State v. McKinney*, 20-19 (La. App. 5 Cir. 11/4/20), 304 So.3d 1097, 1102. As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at the trial established guilt beyond a reasonable doubt but whether, upon review of the whole

record, any rational trier of fact would have found guilt beyond a reasonable doubt. *Id.* at 1103.

In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *Lane*, *supra*. Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *McKinney*, *supra*.

Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. Where the key issue is the identification, the State is required to negate any reasonable probability of misidentification to carry its burden of proof. *State v. Smith*, 20-177 (La. App. 5 Cir. 4/28/21), 325 So.3d 482, 488, *writ denied*, 21-975 (La. 11/17/21), 327 So.3d 992; *State v. Davis*, 18-485 (La. App. 5 Cir. 4/10/19), 269 So.3d 1123, 1131, *writ denied,* 19-716 (La. 11/12/19), 282 So.3d 229.

Defendant was convicted of armed robbery. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64. To support a conviction for armed robbery, the State must prove that there was (1) a taking, (2) of anything of value, (3) from the person of or in the immediate control of another, (4) by use of force or intimidation, (5) while armed with a dangerous weapon. *State v. Collins*, 04-1443 (La. App. 5 Cir. 7/26/05), 910 So.2d 454, 457-58. A gun used in connection with a robbery is, as a matter of law, a dangerous weapon. *State v. Williams*, 12-687 (La. App. 5 Cir. 5/16/13), 119 So.3d 228, 233, *writ denied*, 13-1335 (La. 12/2/13), 126 So.3d 500. The act of pointing a gun at a victim is sufficient to prove the required element of force or intimidation for purposes of armed robbery. *Id.*

Defendant was also convicted of possession of a firearm by a convicted felon. To support a conviction for La. R.S. 14:95.1, the State must prove beyond a reasonable doubt that defendant had: (1) possession of a firearm; (2) a prior conviction for an enumerated felony; (3) absence of the ten-year statutory period of limitation; and (4) the general intent to commit the offense. *Woods*, 376 So.3d at 1156.

Defendant does not contest on appeal that the State failed to prove any specified essential statutory element of La. R.S. 14:64 or La. R.S. 14:95.1. Rather, Defendant argues that the State failed to negate any reasonable probability of misidentification of the perpetrator of the crimes of armed robbery and felon in possession of a firearm because Ms. Simonett did not positively identify him in a photographic lineup, or in court at trial.

Both the State and Defendant cite to *Preston*, *supra*. In *Preston*, the defendant argued that the evidence was insufficient to support a jury's finding that he was the person who committed the armed robbery. *Preston*, 178 So.3d at 213. The defendant's argument was based on the absence of any witness capable of identifying him as the perpetrator of the armed robbery against the victim. *Id.* The victim could not provide a clear description of the face of the man who stole her purse at gunpoint one night when she was on her way to church or identify the perpetrator out of a lineup. Defendant also argued that another witness' (his girlfriend's mother) testimony cast doubt on his identity as the perpetrator. That witness testified that another individual confessed to her that he robbed an "old lady" at gunpoint in front of a church. She testified that the individual told her that he had fled a residence at 728 Filmore Street and was present in the house when the defendant was arrested. On cross-examination, the witness admitted she did not have personal knowledge of the truth of the alleged confession by the other individual. *Id.*

In *Preston*, the State presented the testimony of the victim who stated that a "young black male" armed with a gun took her purse from her while she was outside of her church. *Id.* at 214. Police officers then pursued a fleeing suspect, who was later identified as the defendant, in the vicinity of the church shortly after the robbery and tracked him to the house at 728 Filmore Street. Inside, the officers discovered the defendant attempting to hide from police under a bed with his arms and legs covered in mud, consistent with the fleeing suspect who had hidden beneath the raised home. The police found the victim's cell phone in a dresser drawer located next to the area where the defendant was attempting to hide. Upon further investigation the police found the other items stolen from the victim's purse in the same house where the defendant was apprehended, and a silver pistol, consistent with the victim's testimony, in the area where the police chased the defendant before finding him inside the house at 728 Filmore Street.

This Court discussed that although the other witness' testimony may have suggested an alternative suspect, she also testified that she had no personal knowledge as to the truth of the confession. The defendant did not put forth any evidence tending to prove the truth of the alleged confession. Further, there was no evidence that the man the witness identified was present at the house on Filmore Street on the evening of the armed robbery. *Id.* This Court pointed out that, even assuming that the confession was true, it found that the State presented sufficient evidence to link the defendant to the crimes charged. Accordingly, this Court concluded that the evidence of the defendant's identity as the perpetrator of the armed robbery sufficiently negated any possibility of misidentification, and that the assignment of error was without merit. *Id.* at 214.

Defendant also cites to *State v. Chism*, 591 So.2d 383 (La. App. 2d Cir. 1991), and argues that the facts of the instant matter are similar. In *Chism*, the defendant was convicted of armed robbery. *Id.* During the investigation of the

robbery, the victim was shown a photographic lineup of suspects. At trial, the victim testified that he selected the photo of the defendant. The victim also testified that the defendant was not the perpetrator because the perpetrator "had two good eyes" and one of the defendant's eyes "is messed up or hurt or whatever." In short, "[t]he victim testified that the individual in the photo robbed him but, without equivocation, that the individual seated in the courtroom *did not.*" Id. at 387 (J. Hightower, concurring) (Emphasis in original).

The second circuit explained,

> [t]he victim's inability at trial to identify a suspect whom he had previously selected (by photo) as the robber undermines the credibility of his out-of-court identification. Such testimony is analogous to impeached testimony, which as a general rule cannot stand alone to convict. With no other evidence to name Chism as a participant in the offense, and trial testimony that absolves him, the prior out-of-court identification is simply insufficient to negate the reasonable possibility of misidentification. *State v. Brady, supra.* Even viewed in light most favorable to the state, Wright's testimony amounts to an internal contradiction on the critical issue of the case.

*Id.* at 386. (Citations removed).

The court found that "the out-of-court, unsworn, photo identification was fatally weakened when the victim subsequently testified at trial that the defendant was not the perpetrator and admitted that his photo identification could have been mistaken because of the circumstances of the incident." *Id.* Without any other evidence to prove the defendant committed the offense, the court found the State failed to persuade a rational trier of fact beyond a reasonable doubt that the defendant was indeed the perpetrator, and it reversed his conviction and sentence. *Id.*

However, in the instant matter, the State presented sufficient evidence to prove Defendant's identity as the perpetrator of the crimes despite the victim's failure to identify him. Ms. Simonett stated that the man who robbed her at gunpoint and took her car on April 24, 2022, was named "Ruga," whom she had

met the day before at Klean King car wash. She described "Ruga" as a Black male wearing a dark shirt, dark pants, and a "do-rag" on his head. Ms. Simonett told Detective Hymel that the perpetrator called her on April 24, 2022, at approximately 9:00 to 9:30 p.m. and asked for a ride from Klean King to Riverside Court Condominiums. Detective Hymel recovered surveillance video from Klean King from April 24, 2022, that showed a black sedan, which he identified as Ms. Simonett's vehicle, arriving at 9:37 p.m. He identified a subject in dark clothing walking toward the vehicle. He testified that the vehicle then traveled westbound on Veterans Memorial Boulevard.

On April 29, 2022, Ms. Simonett's vehicle was located near Lapalco and Wall Boulevards in Gretna. Officer Riley noticed that the driver of the car was a white female, and the passenger was a black male. The car was a black Chevrolet Sonic, which belonged to Ms. Simonett. JPSO pursued the stolen vehicle as it fled. The vehicle was recovered after it crashed into a residence and was totaled. Evidence of flight, concealment, and attempt to avoid apprehension is relevant and admissible to prove consciousness of guilt from which the trier-of-fact may infer guilt. *Davis*, 269 So.3d at 1132.

A search of the totaled vehicle produced various items, including a black backpack, Ms. Simonett's debit card, a license issued to Kayla LeBlanc, and two iPhones. The black iPhone found in Ms. Simonett's vehicle had a photograph of a black male with a short beard, wearing a "do-rag," kissing a white female. An extraction of the black iPhone found in Ms. Simonett's vehicle reflected that the device name was "Joshua's iPhone," the Apple ID was "joshuadennis463@gmail.com," and a snapchat name associated with the phone was "rugaxsavage." The phone number of the iPhone was 504-***-5991.

Phone records from Ms. Simonett's phone revealed that she received phone calls from 504-***-5991 on April 24 at 9:13 p.m. and 9:32 p.m. On April 11, 2022,

9-1-1 received a call from 504-***-5991. The caller reported that his name was Joshua, confirmed that he was calling from his phone, and advised that his girlfriend, "Kayla," was sick. The caller's location was the Klean King car wash.

The red iPhone found in Ms. Simonett's vehicle had notifications on the lock screen. One of the notifications was an Instagram message from "rugaxsavage9." An extraction of the red iPhone revealed that it was registered to "Kayla LeBlanc" with the e-mail "kkleblanc2617@gmail.com." The 504-***-5991 phone number was saved as "my favorite a**hole" and the e-mail address associated with that contact was "joshuadennis463@gmail.com." A search of the Instagram name "rugaxsavage9" revealed numerous photographs of Defendant. A law enforcement database search revealed that "Joshua Dennis" and "Joshua Martin" were the same person. Photos found on Defendant's Instagram captured him with a firearm in his pocket standing in front of the Klean King car wash. Defendant's "B" hand tattoo was also captured in the photo.

Text messages between Defendant's phone number and Kayla's phone number were discovered and included texts sent from April 22nd to April 26th. One conversation included messages sent on April 24, 2022, at 9:44 p.m. discussing a tracker and a "computer dash." A message was also sent from Kayla to Defendant that stated, "Get it." The police extracted Google searches from Kayla's iPhone seeking information on vehicle tracking features that were performed during the same time frame when the text messages were sent between Defendant and Kayla on the evening of the robbery, April 24, 2022. The extraction from Kayla's phone also revealed a video dated April 25, 2022, that showed Ms. Simonett's vehicle. There was a "B" tattooed on the right hand of the person filming the video.

Location data from Defendant's phone records revealed that he was near Klean King at the times the phone calls were made to Ms. Simonett on the night of the armed robbery.

After Defendant and Kayla were arrested, Kayla's iPhone was collected and searched. In an Instagram conversation from April 30, 2022, Kayla alluded to being injured in a "real bad wreck." Detective Hymel testified that Kayla identified a picture of herself and the male as "Ruga." She also identified the black bag and red iPhone found in Ms. Simonett's vehicle as her own. Detective Hymel also testified that Klean King employees told him that Defendant was in a relationship with a white female.

In his statement, Defendant eventually admitted to Detective Hymel that his nickname was "Ruga". He denied any involvement in the armed robbery or taking of anyone's vehicle though, and claimed that he and Kayla's phones were stolen on April 1, 2023. He insinuated that someone else had his phone and was pretending to be him.

The jury heard Defendant's statement and his denial of any involvement in the crimes. The jury was also presented with the evidence that Ms. Simonett could not identify Defendant in a photographic lineup as the perpetrator and her testimony that the perpetrator was not in court. The jury heard Detective Hymel's testimony that Ms. Simonett did not mention that the perpetrator had dreadlocks or any tattoos in her initial statement to the responding officer or in her statement to the detective, which he believed was a "misremembrance." The armed robbery occurred on April 24, 2022. The photographic lineup procedure took place a few months later in July 2022. Trial took place on December 4, 2023.

Considering the foregoing, although there was no in-court identification of Defendant similar to *Chism*, *supra*, we find the State presented sufficient evidence in this matter to prove the identity of Defendant as the perpetrator. In *Chism*, the

earlier photo identification of the defendant was the only evidence that linked him to the crime. In this case, the police were able to use cell phone records, social media posts, and 9-1-1 records to identify Defendant and his girlfriend and corroborate Ms. Simonett's account of what occurred the night of the armed robbery.

Despite the lack of identification by Ms. Simonett, similar to *Preston*, *supra*, we find that the overwhelming amount of evidence that was presented to the jury overcame Defendant's claim of innocence, and the State proved Defendant's identity as the perpetrator. Therefore, we find that a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found beyond a reasonable doubt that the evidence was sufficient to find that Defendant committed the offenses under the standard set forth in *Jackson*.

### *ERRORS PATENT*

The record was reviewed for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990).

The trial judge failed to impose the mandatory fine required by La. R.S. 14:95.1(B). At the time the offense was committed, La. R.S. 14:95.1(B) required a fine of not less than one thousand dollars nor more than five thousand dollars to be imposed. While an appellate court has the authority to correct an illegal sentence, this authority is permissive rather than mandatory. La. C.Cr.P. art. 882. Defendant appears to be indigent as he is represented by the Louisiana Appellate Project, which represents indigent defendants in non-capital cases; therefore, we decline to remand this matter for imposition of the mandatory fine as to count two. *See Woods*, 376 So.3d at 1159.

Last, out of an abundance of caution, we advise Defendant that no application for post-conviction relief, including applications that seek an out-of-

time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922. *See State v. Taylor*, 20-215 (La. App. 5 Cir. 4/28/21), 347 So.3d 1008, 1023.

## *DECREE*

For the foregoing reasons, Defendant's convictions and sentences are affirmed.

**<u>AFFIRMED</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY <u>FEBRUARY 26, 2025</u> TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 24-KA-233

<u>**E-NOTIFIED**</u>
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN D. ENRIGHT, JR. (DISTRICT JUDGE)
MONIQUE D. NOLAN (APPELLEE)      THOMAS J. BUTLER (APPELLEE)      MARY CONSTANCE HANES (APPELLANT)

<u>**MAILED**</u>
ERIC CUSIMANO (APPELLEE)
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
PIPER SCOTTON (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053